(No. 87-CC-4188–)

CHARLES R. DeWITT, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 29, 1991.*

HARRIS, LAMBERT & WILSON, for Claimant.

Roland W. Burris, Attorney General (Edward W. Dwyer, Assistant Attorney General, of counsel), for Respondent.

## OPINION

Sommer, J.

The Claimant, an inmate at the time with the Illinois Department of Corrections, seeks damages against the Respondent, State of Illinois, for pain and suffering, future medication, and permanent injury based on a slip and fall which occurred at the Shawnee Correctional Center on October 1, 1986.

The Claimant's *pro se* complaint originally sought $10,000.00 in damages. The Claimant, now represented by counsel, has made a motion to amend pleadings to conform to proof asking for leave to amend the complaint to seek an award of $20,000.00.

On the date in question, the Claimant was employed as a clerk for Southeastern Illinois College in an office located on the first floor of the vocational building at Shawnee. The entrance to that building consisted first of a pair of exterior glass doors from the outside into a foyer. Located in the foyer is a metal detector and table for the purpose of checking inmates for metal being brought into or out of the building. A stairway to the second floor of the building rises to the left upon entering the foyer.

From the foyer into the interior of the lower level of the building, there is a set of interior glass doors leading to a general reception area. Through the interior glass doors, a desk is located as a station for a security officer whose assignment is to control and monitor the movement of inmates into and out of the building.

The Claimant testified that he had reported to his assignment in an office on the first floor of the vocational building at 8:30 a.m. Later in the morning, in connection with his job, he was required to visit an office on the second floor of the building. He went upstairs to an office on the second floor where he remained approximately ten to fifteen minutes. Thereafter, he descended the stairs and walked through the interior glass doors into the reception area. Immediately after passing through the interior glass doors, his left foot slipped and he fell breaking his ankle. The Claimant stated that the floor surface was a highly cleaned and buffed, very shiny tile floor. The Claimant further stated that when he fell, the floor was damp and exceptionally slick.

The Claimant testified that there were no warning cones or other precautionary signs which would have alerted him that the floor was damp. At the time of the fall, the Claimant was wearing State issued shoes with hard soles. Additionally, he testified that he would not have been able to leave the building and re-enter without a pass issued by the prison authorities. He stated that no such pass had been issued to him, and he had not left the building.

The Claimant deposed inmate Stock as a witness. On the date in question, Stock was a janitor in the vocational building. At the time of the Claimant's fall, Stock stated he was seated just inside the interior glass

doors next to the desk talking to Officer Shanks; and he saw the Claimant come down the stairs, go through the interior doors and slip and fall down. Stock testified that another janitor, Humphrey, had just finished mopping the floor. Inmate Stock confirmed that there were no warning signs or plastic pylons on display intending to warn pedestrian traffic of the slick floor, but that there were two warning cones kept in a supply closet. Stock also testified that the warning pylons were available to any janitor by simply asking the security officer at the desk to unlock the supply closet.

The Respondent's witness, Officer Shanks, was working at the vocational building at the security desk on the date of the Claimant's injury on a temporary basis for the first time. Officer Shanks testified that she saw the Claimant come from outside through the exterior glass doors and enter the reception area through the interior doors where he fell. Officer Shanks recalled inmate Stock being present in the reception area at the time of the Claimant's fall, but she did not see any mopping. Officer Shanks had no recollection of the weather condition that day. She did state that inmate Stock was not seated next to the desk but rather in a chair along the wall next to the interior doors, but she did not recall whether Stock was looking into the outside foyer at the time of the fall.

Officer Shanks testified that she did not recall if the floor had been washed that morning. She said she did not recall if the floor was wet at the time of the Claimant's fall; and she did not see any "wet floor" signs the morning of the Claimant's fall.

The Respondent's Sergeant McQueen testified that although he was in the vocational building at the time of the Claimant's fall, he was not in the reception area. He

was called to the reception area where he found the Claimant injured. Sergeant McQueen testified that there was no dampness on the floor. Sergeant McQueen further testified that a safety cone had been placed in the outside foyer next to the "shakedown" table by the metal detector just inside the outside glass doors. Sergeant McQueen testified he had placed the cone in the foyer because he believed that when he came to work rain was falling. When it was raining the floor could become slick because of water on shoes. On cross-examination, Sergeant McQueen stated he was not sure what the weather was on the date of the Claimant's fall, but to the best of his memory it was raining. Sergeant McQueen was sure there were no safety cones present in the reception area where the Claimant fell. Sergeant McQueen testified that he trains the janitors or "porters" to put out warning signs when the floors were slick or damp. Additionally, he stated inmate Humphrey was zealous at keeping the floor waxed, buffed and mopped perhaps more than needed, but sometimes forgot to put out the cones.

Inmate Humphrey, deposed as a witness by the Respondent, testified that on the date in question, he was working as a "porter" on the first floor of the vocational building, and that he had mopped the floor prior to the Claimant's fall. Humphrey testified that the floor was still damp when the Claimant fell. Additionally, he testified that he had forgotten to put down safety cones at the time of the fall. Humphrey stated that somebody had spilled water at the location where the Claimant fell, and he had attempted to clean up the water with a mop. Humphrey recalled that Officer Shanks had spoken to him after the Claimant's fall about not putting out any warning cones. Additionally, he stated that he did not

know the Claimant and only talked to the Claimant once after the fall to joke with him.

With respect to the injury, the Claimant contended that there was immediate swelling in his ankle and severe discomfort. A cast was placed on his ankle the next afternoon by Dr. Frazier. The Claimant remained in a cast until October 25, 1986, after which he wore an orthopaedic shoe until November 10, 1986. The Claimant took Motrin for pain for two or three months after the fall, but the pain in his left leg was constant through February, 1987. DeWitt testified that he was still experiencing pain at the time of the hearing depending on changes of weather and the level of his activities, including how much time he had to spend on his feet each day. The Claimant testified that he still takes Motrin and Advil three or four times a month at an average cost of $10.00 per month. The Claimant stated that his activities after the broken ankle changed considerably and that he was not able to walk for exercise, lift weights or play basketball; and the Claimant generally has to watch what he does to avoid aggravating the ankle.

The deposition of Dr. Ralph Frazier, the treating physician, was made a part of the evidence. Dr. Frazier testified that he diagnosed a fractured left ankle. Dr. Frazier prescribed Motrin for the patient. Dr. Frazier removed the Claimant's cast October 25, 1986, and kept him in an orthopaedic shoe until November 10, 1986. Dr. Frazier restricted the Claimant from performing his regular work assignments at the Correctional Center from October 1, 1986, through October 10, 1986. Dr. Frazier's final diagnosis was an undisplaced fracture of the left lateral maleolus commonly known as a fractured ankle. When Dr. Frazier last saw the Claimant he expected a good prognosis.

This Court has repeatedly held that the State owes a duty to inmates of penal institutions to provide reasonably safe conditions. *Reddock v. State* (1978), 32 Ill. Ct. Cl. 611.

There is no doubt that the Claimant fell where he said he did and that he was traversing a slick floor at the time. All witnesses who spoke on the topics agreed that the Claimant was wearing hard soled shoes and that the floor in question was frequently waxed and buffed to a high shine. The Claimant had no choice but to wear the shoes and walk on the floor.

The Claimant contends that the risk of injury was increased because the floor was wet and he did not know about it, as no warning was given. The inmate porters, Stock and Humphrey, testified that the floor was wet, because Humphrey had mopped just before the fall. Officer Shanks, the guard on duty, who witnessed the fall testified that she could not recall the floor being mopped, had not seen inmate Humphrey and did not recall whether the floor was wet. Sergeant McQueen stated that there was no dampness on the floor.

The Respondent's argument is that the Claimant entered the building from the outside. There had been rain that day and his shoes would have been wet. He would have seen the warning cone in the exterior foyer and, therefore, would have had warning.

Upon examination of the record and the recommendation of Commissioner Rath who heard the testimony of the Claimant and the guards, this Court finds that the Claimant fell and was injured as a direct and proximate result of moisture left by inmate Humphrey's mopping an already slick floor. We find that the Claimant's

account of the incident is credible, and he would have had no warning that inmate Humphrey had mopped the floor when he was upstairs. Moisture on the highly polished floor would not have been readily evident and no cones were placed out. The Respondent presented some evidence supporting its theory, but a pass would have had to have been issued to the Claimant so he could leave the building. The issuing of a pass would have required official action by someone in the prison administration. No such testimony was introduced. Additionally, as Officer Shanks was new to the duty, she would not necessarily have known the inmates working at the site or the nature of their duties, so that she might instruct them. By giving no warning of the floor's condition, the State violated its duty to provide reasonably safe conditions.

This Court finds that the Claimant's testimony and the testimony of the Claimant's physician establish that the Claimant had a routine non-displaced fractured ankle. The doctor believed the Claimant would have a good prognosis. The Claimant's testimony was that he went through considerable discomfort and is likely to have weakness in the ankle for an indefinite period of time, which causes him to restrict some activities which he earlier enjoyed. The Claimant had not sought medical treatment for the ankle for some time prior to the hearing.

Though the Claimant stated that he was expending $10.00 per month on the average for medication at the time of the trial, there is no expert evidence that this could continue for an additional 28.2 years as claimed.

The injury itself and the prognosis is unremarkable and typical. The Claimant has incurred pain and suffering and may have some weakness in the ankle in

the future, however expert medical testimony as to the permanency of the Claimant's injury is lacking.

The Court finds damages in the amounts of $500.00 for medication, and $8,000.00 for pain and suffering and whatever permanent loss of function the Claimant has incurred. Therefore, it is ordered that the Claimant be paid $8,500.00, and that the motion of the Claimant to amend is therefore denied.